James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANITA BURTON, DENNIS E. KWIATKOWSKI, RACHEL ANN ZAFRA, and ADAM ROGERS, individually and on behalf of minor children C.A.R. and C.M.R.,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CONDUENT BUSINESS SERVICES, LLC and HEALTH CARE SERVICE CORPORATION**,<br><br>Defendants. | **Case No.:**<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Anita Burton, Dennis E. Kwiatkowski, Rachel Ann Zafra, and Adam Rogers (individually and on behalf of minor children C.A.R. and C.M.R.) ("Plaintiffs"), individually, and on behalf of all others similarly situated ("Class Members"), by and through undersigned counsel, bring this Class Action Complaint against Conduent Business Services, LLC ("Conduent") and Health Care Service Corporation ("HCSC") (collectively, "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those

allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiffs and proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") that was affected in a data breach (the "Data Breach" or the "Breach").

2. Plaintiffs' claims arise from Defendants' failure to properly secure and safeguard Private Information entrusted to it and its accompanying responsibility to store and transfer that information.

3. Conduent is a provider of digital business solutions and services to clients across the healthcare, commercial, government, and transportation sectors (the "Clients"), and maintains its principal place of business in Florham Park, Morris County, New Jersey.[2]

---

[1] "Personally identifiable information" generally means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. *Id.*

[2] *About Conduent*, Conduent Bus. Servs., LLC, https://investor.conduent.com/static-files/feda5a28-eabe-4fea-8241-7e4685fbe660 (last visited Oct. 27, 2025).

4. Conduent had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiffs and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

5. On January 13, 2025, Conduent discovered that it was the victim of a cyber incident.[3] Conduent then launched an investigation to determine the nature and scope of the Data Breach.[4]

6. Conduent's investigation determined that an unauthorized third-party accessed its IT Network from October 21, 2024, to January 13, 2025, and exfiltrated from Conduent's IT Network files containing Private Information of individuals obtained by Conduent's Clients.[5]

7. Upon information and belief, the following types of Private Information were compromised in the Data Breach: name, Social Security number ("SSN"), date of birth, and medical and health insurance information.

8. The Conduent Clients whose customers' Private Information was compromised in the Data Breach include HCSC. HCSC is the fifth-largest health

---

[3] *Data Breach Notifications*, Conduent Business Services, LLC, Off. of the Me. Att'y Gen., https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3208 (last visited Oct. 27, 2025).
[4] *Id.*
[5] *Id.*

insurance company in the United States and holds licensing rights to the "Blue Cross and Blue Shield" name in five states, including Illinois, where it does business as "BlueCross BlueShield of Illinois" ("BCBS IL").

9. Conduent provides various back-office services for HCSC, including claims administration, payment processing, and mailroom services. For Conduent to provide these services to HCSC, HCSC grants Conduent access to its insureds' Private Information.

10. On or around October 24, 2025—***ten months*** after discovering the Data Breach—Conduent issued a notice of public disclosure about the Data Breach.

11. Conduent failed to take precautions designed to keep individuals' Private Information secure.

12. Defendants owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information it collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached their duty by failing to implement or maintain adequate security practices.

13. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves.

14. In possession of the Private Information accessed in the Data Breach (and a ten-month head start), data thieves can commit crimes including, *e.g.*,

opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

15. Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses including identity theft and other fraudulent misuse of their Private Information, loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

16. Plaintiffs bring this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained and its failure to provide timely and adequate notice to affected patients, including Plaintiffs and Class Members, of the Breach and the types of information unlawfully accessed.

17. Because the potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Conduent, it was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to a data breach.

18. Upon information and belief, Conduent failed to properly monitor and implement security practices for the computer network and systems that housed the Private Information. Had Conduent properly monitored its IT network, it would have discovered the Data Breach sooner.

19. Because the Private Information Conduent collected and maintained is now in the hands of data thieves and other unauthorized third parties, Defendants' negligent conduct has left Plaintiffs and Class Members' identities and assets at risk.

20. Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

21. Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence, negligence *per se*, unjust enrichment, breach of third-party beneficiary contract, and statutory claims under Illinois state law.

## PARTIES

***Plaintiffs***

22. Plaintiff Anita Burton is a citizen and resident of Chicago, Cook County, Illinois.

23. Plaintiff Dennis E. Kwiatkowski is a citizen and resident of Alsip, Cook County, Illinois.

24. Plaintiff Rachel Ann Zafra is a citizen and resident of River Grove,

Cook County, Illinois.

25. Plaintiff Adam Rogers and his minor children C.A.R. and C.M.R. are residents of Warrenville, DuPage County, Illinois.

***Defendants***

26. Defendant Conduent is a New Jersey corporation maintaining its principal place of business at 100 Campus Drive, Suite 200, Florham Park, Morris County, New Jersey, 07932.

27. Defendant HCSC is an Illinois corporation with its principal place of business located at 300 E Randolph St, Chicago, Cook County, IL 60601.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants' citizenship.[6] Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A).

[6] Adler, Steve, *Business Associate Data Breach Affects 462,000 Blue Cross Blue Shield of Montana Members* https://www.hipaajournal.com/blue-cross-blue-shield-montana-data-breach/ (last visited Oct. 27, 2025).

29. This Court has personal jurisdiction over Defendant Conduent because Conduent is registered to do business and maintains its principal place of business in this District.

30. This Court also has personal jurisdiction over Defendant HCSC because HCSC has sufficient minimum contacts in New Jersey by transacting business in this state, including contracting with New Jersey citizen Conduent for storing Plaintiffs' and Class Members' Private Information, and Plaintiffs' claims arise from that activity. Venue is proper in this Court because Defendant Conduent's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims, including Conduent's management of Plaintiffs' and Class Members' Private Information on behalf of HCSC, occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

31. Conduent is a provider of digital business solutions and services to clients across the healthcare, commercial, government, and transportation sectors (the "Clients") and maintains its principal place of business in Florham Park, Morris County, New Jersey.[7]

[7] *About Conduent*, *supra* note 2.

32. As a condition of doing business, Conduent requires that its Clients entrust it with highly sensitive personal information belonging to their clients. In the ordinary course of receiving service from Conduent's Clients, Plaintiffs and Class Members were required to provide their Private Information to Defendants.

33. Upon information and belief, Defendants made promises and representations to individuals, including Plaintiffs and Class Members, that they would keep the Private Information collected from them safe, confidential, and private.

34. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

35. By collecting and storing the Private Information of Plaintiffs and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

36. On January 13, 2025, Conduent discovered that it was the victim of a cyber incident.[8] Conduent launched an investigation to determine the nature and scope of the Data Breach.[9]

37. Conduent's investigation determined that an unauthorized third-party accessed its IT network from October 21, 2024, to January 13, 2025, and exfiltrated files on Conduent's IT network containing Private Information of individuals obtained by Conduent's Clients, including, upon information and belief, HCSC.[10]

38. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, date of birth, medical and health insurance information.

39. On or around October 24, 2025—***ten months*** after becoming aware of the Data Breach—Conduent issued a notice of public disclosure about the Data Breach.

40. Conduent had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

---

[8] *Data Breach Notifications*, *supra* note 3.
[9] *Id.*
[10] *Id.*

41. Conduent failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information maintained for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

42. The Data Breach resulted in an unauthorized third-party accessing and acquiring files containing Plaintiffs' and Class Members' unencrypted Private Information.

43. Upon information and belief, Plaintiffs' and Class Members' Private Information, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

44. Defendants failed to take precautions designed to keep individuals' Private Information secure.

45. Conduent could and should have prevented the Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members but failed to do so.

46. HCSC could and should have prevented the Data Breach by adequately supervising Conduent's cybersecurity practices to ensure they were sufficient to protect Plaintiffs' and Class Members' Private Information against unauthorized disclosure but failed to do so.

47. Individuals affected by the Data Breach are, and remain, at risk of their data being sold or listed on the dark web and, ultimately, illegally used in the future.

**C. Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Private Information**

48. As a condition of obtaining services from Conduent's Clients, including HCSC, Plaintiffs and Class Members were required to give their sensitive and confidential Private Information to Defendants.

49. Defendants retain and store this information and derive a substantial economic benefit from the Private Information they collect. But for the collection of Plaintiffs' and Class Members' Private Information, Defendants would be unable to perform their services.

50. At all relevant times, Conduent knew it was storing sensitive Private Information and that, as a result, its system would be an attractive target for cybercriminals. HCSC also knew Conduent was storing this Private Information on its behalf, which made Conduent a potential target for attempts to steal that Private Information.

51. Defendants also knew that a breach of their systems and exposure of the information stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

52. Defendants could have prevented the Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

53. Upon information and belief, Defendants made promises to Plaintiffs and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

54. Defendants' negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts from governments, industry groups, and civil society directed to ensuring entities like Defendants protect and secure sensitive data.

**D. Defendants Knew or Should Have Known of the Risk of a Cyberattack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable**

55. Data thieves regularly target entities in the healthcare industry, like Defendants, due to the highly sensitive information they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

56. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting

healthcare entities like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

57. In light of recent high profile data breaches at other industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Progress Software (93.3 million records, May 2023), AT&T (51.2 million individuals, April 2024) Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

58. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[11]

59. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[12]

---

[11] 2024 Data Breach Annual Report, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited Aug. 25, 2025).
[12] *Id.*

60. Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[13] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14] According to the report, almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[15]

61. Indeed, cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendants have become so notorious that the FBI and U.S.

---

[13] *See* Identity Theft Res. Ctr., 2022 Annual Data Breach Report, https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final.pdf (last visited Aug. 25, 2025).

[14] *See* Elinor Mills, Study: Medical identity theft is costly for victims, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 25, 2025).

[15] *See id.*

Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[16]

62. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

63. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on its server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

64. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

65. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[16] FBI, Secret Service Warn of Targeted Ransomware, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Aug. 25, 2025).

66. As a healthcare entity in possession of its patients' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members because of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**E. Defendant Failed to Comply with FTC Guidelines**

67. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

68. In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand

their network's vulnerabilities; and implement policies to correct any security problems.[17]

69. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[18]

70. The FTC further recommends that companies not maintain Private Information longer than needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

71. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of

---

[17] Protecting Personal Information: A Guide for Business, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 25, 2025).
[18] *Id.*

the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect patient's data, like Defendants here. *See, e.g., In re LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

73. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

74. Defendants failed to properly implement basic data security practices.

75. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

76. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of their patients; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**F. Defendant Failed to Comply with HIPAA Guidelines**

77. As covered businesses under HIPAA (45 C.F.R. § 160.102), Defendants must comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

78. Defendants are further subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health

Information Technology Act ("HITECH").[19] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

79. HIPAA's Privacy Rule establishes national standards for the protection of health information.

80. HIPAA's Privacy Rule establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

81. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

82. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." *Id.* § 160.103.

83. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
d. Ensure compliance by its workforce.

[19] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

84. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." *Id.* § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." *Id.* § 164.312(a)(1).

85. HIPAA and HITECH also obligate Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See id.* §§ 164.306(a)(1) & (a)(3); *see also* 42 U.S.C. §17902.

86. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

87. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See id.* § 164.530(f).

88. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See id.* §§ 164.302–18. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule.".[20] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[21]

**G. Defendants Failed to Comply with Industry Standards**

89. As noted above, experts studying cybersecurity routinely identify entities in possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

---

[20] US Department of Health & Human Services, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Aug. 25, 2025).

[21] *Guidance on Risk Analysis*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Aug. 25, 2025).

90. These experts have identified several best practices that employers in possession of PII and PHI, like Defendants, should employ, at minimum, including but not limited to: educating all employees; strong passwords; multilayer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multifactor authentication; backup data; and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multifactor authentication.

91. Other cybersecurity best practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email-management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting physical security systems; monitoring and protecting access points in communication systems; and training staff regarding critical security points and potential vulnerabilities. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

92. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01,

PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

93. These foregoing frameworks are existing and applicable industry standards for a business and healthcare provider's obligations to provide adequate data security for its patients' sensitive information. Upon information and belief, Defendants failed to comply with at least one—or potentially, any—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### H. Defendants Owed Plaintiffs and Class Members a Duty to Safeguard their Private Information

94. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

95. Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

96. Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

97. Defendants owed a duty to Plaintiffs and Class Members to act on data security warnings and alerts in a timely manner.

98. Defendants owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

99. Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

## I. The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft

100. Upon information and belief, Plaintiffs' and Class Members' unencrypted Private Information has been publicly posted on a dark web leak page and will end up further disseminated and sold to criminals on the dark web because that is the *modus operandi* of cybercriminals.

101. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without Plaintiffs' and Class Members' approval.

102. Simply put, the Data Breach has left Plaintiffs' and Class Members' Private Information easily accessible to unauthorized individuals.

103. Cyberattacks and data breaches at healthcare companies like Defendants are especially problematic because they can have an especially negative impact on the physical health and overall daily lives of individuals affected by the attack.

104. Researchers have found that, among healthcare service providers that experienced a data security incident, the death rate among patients increased in the months and years after the attack.[22]

105. Researchers have further found that at healthcare service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[23]

---

[22] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[23] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Servs. Rsch. 971, 971–80 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6736905/pdf/HESR-54-971.

106. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. They do so by selling the stolen information on the black market to other criminals who then use the information to commit a variety of identity theft related crimes discussed below.

107. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of ways for criminals to exploit Plaintiffs and Class Members and profit from their misfortune.

108. As a result of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;
b. The diminution in value of their Private Information;
c. The compromise and continuing publication of their Private Information;
d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
f. Delay in receipt of tax refund monies;
g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

109. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

110. The value of Plaintiffs' and Class Members' Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available—for a substantial fee of course.

111. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

112. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

113. Cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to stolen data to assemble complete dossiers on individuals with an astonishingly complete scope and degree of accuracy. These dossiers are known as "Fullz" packages.

114. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or payment card numbers may not have been included in the Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact—including this Court or a jury—to find that Plaintiffs' and Class Members' stolen Private Information is being misused and that such misuse is fairly traceable to the Data Breach.

115. Identity thieves can also use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new

driver's license or ID, and/or use the victim's information in the event of arrest or court action.

116. Identity thieves can also use the victim's name and SSN to obtain government benefits or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN and/or rent a house or receive medical services in the victim's name.

117. The Social Security Administration has similarly warned that identity thieves can use an individual's SSN to apply for additional credit lines.[24] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen SSNs also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[25] Each of these fraudulent activities is difficult to detect. An individual may not know that their SSN was used to file for unemployment benefits until law enforcement notifies their employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

118. Further, an individual cannot obtain a new SSN without significant paperwork, administrative burden, and evidence of actual misuse. Even then, a new

[24] *Id.*
[25] *Id. at* 4.

SSN may not be effective because "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[26]

119. This was a financially motivated Data Breach; the only reason cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendants is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

120. Indeed, an SSN, date of birth, and full name can sell for $60 to $80 on the digital black market.[27] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the

---

[26] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[27] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PC Mag (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

dark web."[28]

121. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PHI/PII, *they will use it*.[29]

122. Without prompt notification, thieves have ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[30]

123. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[31]

124. Defendants' failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated their injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other

---

[28] *Dark Web Monitoring: What You Should Know*, Consumer Fed'n of Am. (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[29] *Id.*

[30] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, Experian, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf [hereinafter *Potential Damages*] (last visited Aug. 25, 2023).

[31] Guide for Assisting Identity Theft Victims at 4, FTC (Sept. 2013), https://www.wyocourts.gov/app/uploads/2025/05/Guide-for-Assisting-Identity-Theft-Victims.pdf.

necessary steps to mitigate the harm caused by the Data Breach.

**J. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

125. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

126. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

127. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and securing their own computer systems.

128. Plaintiffs' mitigation efforts are consistent with the conclusions of the U.S. Government Accountability Office' 2007 report regarding data breaches ("GAO Report"), which noted that victims of identity theft will face "substantial

costs and time to repair the damage to their good name and credit record."[32]

129. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

130. And for those Class Members who experience actual identity theft and fraud, the GAO Report found victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**K. Diminution of Value of Private Information**

131. Private Information is valuable property.[34] Its value is axiomatic, considering the value placed on "Big Data" in corporate America and the heavy penal consequences of cybercrime, include lengthy prison sentences. The

---

[32] *See* U.S. Gov't Accountability Off., GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007), https://www.gao.gov/new.items/d07737.pdf [hereinafter 2007 GAO Report].

[33] *See* Identity Theft.gov, FTC, https://www.identitytheft.gov/Steps (last visited Aug. 25, 2025).

[34] *See* 2007 GAO Report, *supra* note 32.

significant risks and rewards associated with Private Information illustrate that it has considerable market value.

132. The Private Information stolen in the Data Breach is significantly more valuable than credit card information obtained in a large retailer data breach, for example. Victims affected by those retailer breaches could avoid much of the potential future harm by cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

133. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[35]

134. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[36]

135. An active and robust legitimate marketplace for Private Information also exists. In 2024, the data brokering industry was worth roughly $280 billion and

[35] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[36] *See, e.g.*, *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/.

projected to grow to over $500 billion in the next decade.[37] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who, in turn, aggregates the information and provides it to marketers or app developers.[38] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[39]

136. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, their Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

137. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[37] *See* https://www.grandviewresearch.com/industry-analysis/data-broker-market-report (last visited Nov. 14, 2025).

[38] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Aug.25, 2025); https://datacoup.com/ (last visited Aug. 25, 2025).

[39] https://www.thepennyhoarder.com/make-money/nielsen-panel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (last visited Aug. 25, 2025).

138. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

139. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Conduent's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

140. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**L. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

141. Given the type of targeted attack here, the sophisticated criminal activity, the volume of data compromised in the Data Breach, and the sensitive type of Private Information involved in the Data Breach, there is a strong probability that entire batches of stolen information have been or will be placed on the black market/dark web for sale and purchase by criminals intending to use the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

142. Such fraud may go undetected until debt collection calls commence months or years later. An individual may not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

143. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

144. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendants' Data Breach. This is a future cost for a minimum of five years, one that Plaintiffs and Class Members would not need to bear had Defendants not failed to safeguard their Private Information.

**M. Loss of the Benefit of the Bargain**

145. Further, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Conduent's Clients, including HCSC, for the provision of their services, Plaintiffs and Class Members, like other reasonable patients, understood and expected that they were, in part, paying for Defendants' service and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security.

Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**N. Plaintiffs' Experiences**

***Plaintiff Anita Burton***

146. Plaintiff Burton is a client of BCBS IL, the name under which HCSC does business in Illinois.

147. As a condition of obtaining health insurance services, Plaintiff Burton was required to provide HCSC with her Private Information, which was in turn provided to Conduent.

148. Plaintiff Burton recalls reviewing a HIPAA disclosure related to her agreement to obtain health insurance services from BCBS IL that promised HCSC would comply with its HIPAA obligations to secure her Private Information.

149. Defendants were in possession of Plaintiff Burton's Private Information before, during, and after the Data Breach.

150. Plaintiff Burton received a Notice Letter from Conduent informing her that her name, address, date of birth, and SSN were among the files affected by the Data Breach.[40]

[40] *See* Ex. A.

151. Plaintiff Burton reasonably understood and expected that Defendants would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Burton would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that HCSC and/or Conduent would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

152. Plaintiff Burton greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

153. Plaintiff Burton stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

154. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

155. Upon information and belief, as a result of the Data Breach, Plaintiff Burton's Private Information was published on the dark web.

156. As a result of the Data Breach, Plaintiff Burton has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit

report, changing her passwords and taking other necessary mitigation efforts. This is valuable time that Plaintiff Burton would have spent on other activities, including but not limited to work and/or recreation.

157. As a consequence of and following the Data Breach, Plaintiff Burton has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

158. As a consequence of and following the Data Breach, Plaintiff Burton has been the victim of attempted financial fraud. In the past year, Plaintiff Burton received an alert that someone was trying open a Wells Fargo bank account in her name. Plaintiff Burton was not a customer of Wells Fargo and had not attempted to open any such account. Around the same time, Plaintiff Burton also noticed an unauthorized charge on her debit card, and with the help of her bank, found a pattern of unauthorized charges dating back several months and totaling around $120. As a result, Plaintiff Burton had to obtain a new debit card.

159. The Data Breach has caused Plaintiff Burton to suffer fear, anxiety, and stress, and she feels her privacy rights have been violated.

160. Plaintiff Burton anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Burton will continue to be at present and continued increased risk of identity theft and fraud for years to come.

161. Plaintiff Burton has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

162. As a direct and traceable result of the Data Breach, Plaintiff Burton suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff Burton and (g) other economic and non-economic harm.

***Plaintiff Dennis E. Kwiatkowski***

163. Plaintiff Kwiatkowski is a client of BCBS IL, the name under which HCSC does business in Illinois.

164. As a condition of obtaining health insurance services, Plaintiff Kwiatkowski was required to provide HCSC with his Private Information, which was in turn provided to Conduent.

165. Defendants were in possession of Plaintiff Kwiatkowski's Private Information before, during, and after the Data Breach.

166. Plaintiff Kwiatkowski received a Notice Letter from Conduent informing him that his name, address, date of birth, and SSN were among the files affected by the Data Breach.[41]

167. Plaintiff Kwiatkowski reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that HCSC and/or Conduent would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

168. Plaintiff Kwiatkowski greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff Kwiatkowski is very concerned about identity theft and fraud,

---

[41] *See* Ex. B.

as well as the consequences of such identity theft and fraud resulting from the Data Breach.

169. Plaintiff Kwiatkowski stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

170. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

171. Upon information and belief, as a result of the Data Breach, Plaintiff Kwiatkowski's Private Information was published on the dark web.

172. As a result of the Data Breach, Plaintiff Kwiatkowski has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Kwiatkowski would have spent on other activities, including but not limited to work and/or recreation.

173. As a consequence of and following the Data Breach, Plaintiff Kwiatkowski has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information. Plaintiff Kwiatkowski now receives three to four calls a day claiming he has been approved for a loan for which he did not apply.

174. As a consequence of and following the Data Breach, Plaintiff Kwiatkowski has also experienced attempted financial fraud. In or around October 22, 2025, Plaintiff Kwiatkowski learned that his bank had frozen his debit card due to unusual charges totaling around $110. As a result, Plaintiff Kwiatkowski was forced to obtain a new debit card.

175. The Data Breach has caused Plaintiff Kwiatkowski to suffer fear, anxiety, and stress, particularly over the consequences of having his SSN exposed.

176. Plaintiff Kwiatkowski anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Kwiatkowski will continue to be at present and continued increased risk of identity theft and fraud for years to come.

177. Plaintiff Kwiatkowski has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

178. As a direct and traceable result of the Data Breach, Plaintiff Kwiatkowski suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not

adequately protect his Private Information; (d) emotional distress because identity thieves now possess her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Kwiatkowski and (g) other economic and non-economic harm.

***Plaintiff Rachel Ann Zafra***

179. Plaintiff Rachel Ann Zafra is a client of BCBS IL, the name under which HCSC does business in Illinois.

180. As a condition of obtaining health insurance services, Plaintiff Zafra was required to provide HCSC with her Private Information, which was in turn provided to Conduent.

181. Defendants were in possession of Plaintiff Zafra's Private Information before, during, and after the Data Breach.

182. Plaintiff Zafra received a Notice Letter from Conduent informing her that her name, address, date of birth, and SSN were among the files affected by the Data Breach.[42]

[42] *See* Ex. C.

183. Plaintiff Zafra reasonably understood and expected that Defendants would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Zafra would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that Conduent and/or HCSC would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

184. Plaintiff Zafra greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

185. Plaintiff Zafra stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

186. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

187. Upon information and belief, as a result of the Data Breach, Plaintiff Zafra's Private Information was published on the dark web.

188. As a result of the Data Breach, Plaintiff Zafra has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit

report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Zafra would have spent on other activities, including but not limited to work and/or recreation.

189. As a consequence of and following the Data Breach, Plaintiff Zafra has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information. In the past year, Plaintiff Zafra has also fielded spam phone calls falsely claiming she has unpaid medical bills, which, on information and belief, were connected to her Private Information exposed in the Data Breach.

190. As a consequence of and following the Data Breach, Plaintiff Zafra has also experienced attempted financial fraud. In or around October 2025, Plaintiff Zafra noticed unusual charges on her debit card totaling around $60 that she had to dispute with her bank.

191. The Data Breach has caused Plaintiff Zafra to suffer fear, anxiety, and stress. In particular, she fears criminals will use her information to impersonate her and open credit cards or apply for loans in her name.

192. Plaintiff Zafra anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Zafra will continue to be at present and continued increased risk of identity theft and fraud for years to come.

193. Plaintiff Zafra has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

194. As a direct and traceable result of the Data Breach, Plaintiff Zafra suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff Zafra and (g) other economic and non-economic harm.

***Plaintiffs Adam Rogers, C.A.R., and C.M.R.***

195. Plaintiff Adam Rogers and his minor children, C.A.R. and C.M.R., are clients of BCBS IL, the name under which HCSC does business in Illinois.

196. As a condition of obtaining health insurance services, Plaintiff Rogers and his minor children were required to provide HCSC with their Private Information, which was in turn provided to Conduent.

197. Defendants were in possession of Plaintiff Roger and his minor children's Private Information before, during, and after the Data Breach.

198. Plaintiff Rogers received a Notice Letter from Conduent informing him that his name, address, date of birth, and SSN were among the files affected by the Data Breach.[43] Plaintiffs' minor children also received Notice Letters stating the same categories of information were also affected for them.[44]

199. Plaintiff Rogers reasonably understood and expected that Defendants would safeguard his Private Information and that of his minor children and timely and adequately notify him in the event of a data breach. Plaintiff Rogers would not have allowed Defendants, or anyone in Defendants' position, to maintain their Private Information if he believed that Conduent and/or HCSC would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

200. Plaintiff Rogers greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information and

[43]*See* Ex. D.
[44] *See* Exs. E & F.

that of his minor children. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

201. Plaintiff Rogers stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts, or those of his minor children.

202. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

203. Upon information and belief, as a result of the Data Breach, Plaintiff Rogers' Private Information was published on the dark web. Around six months ago, Plaintiff Rogers received a notice from a credit monitoring service provided by his credit card company informing him that his information had been published on the dark web.

204. As a result of the Data Breach, Plaintiff Rogers has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Rogers would have spent on other activities, including but not limited to work and/or recreation.

205. As a consequence of and following the Data Breach, Plaintiff Rogers has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information. Plaintiff Rogers has estimated he has experienced a tenfold increase in spam texts and calls in the past year. In at least one call Plaintiff Rogers received, the speaker (who had a foreign accent) referenced his BCBS IL account.

206. As a consequence of and following the Data Breach, Plaintiff Rogers' son, minor C.A.R. experienced attempted financial fraud on with his first debit card. In or around August 2025, Plaintiff Rogers noticed an unusual charge on C.A.R.'s debit card that he had to dispute with the bank. Minor Plaintiff C.R. was required to get a new debit card as a result.

207. The Data Breach has caused Plaintiff Rogers to suffer fear, anxiety, and stress. Beyond being concerned about his own Private Information, Plaintiff Rogers is distressed over the thought that his minor children have experienced and may continue to experience privacy violations and identity theft before they are even of age.

208. Plaintiff Rogers anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Rogers will continue to be at present and continued increased risk of identity theft and fraud for years to come.

209. Plaintiff Rogers has a continuing interest in ensuring that his Private Information and that of his minor children, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

210. As a direct and traceable result of the Data Breach, Plaintiff Rogers and minor Plaintiffs C.A.R. and C.M.R. suffered actual injury and damages after their Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring their accounts and credit reports for fraudulent activity; (b) loss of privacy due to their Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect their Private Information; (d) emotional distress because identity thieves now possess their sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that their Private Information has been stolen and likely published on the dark web; (f) diminution in the value of their Private Information, a form of intangible property that Defendants obtained from Plaintiff Rogers and his minor children and (g) other economic and non-economic harm.

## **CLASS ALLEGATIONS**

211. Plaintiffs bring this class action, individually and on behalf of the

following Nationwide Class and Illinois Subclass:

> **Nationwide Class**: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class").
> **Illinois Subclass**: All individuals residing in the State of Illinois whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach.

212. Specifically excluded from the Class and Illinois Subclass are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

213. Plaintiffs reserve the right to amend the Class and Illinois Subclass definitions above if further investigation and/or discovery reveals that they should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

214. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

215. Numerosity: Both the Class and Illinois Subclass are so numerous that joinder of all Class Members is impracticable. Upon information and belief,

Plaintiffs estimate that the Class is comprised of millions of members, if not more. The Class and Illinois Subclass are sufficiently numerous to warrant certification.

216. Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class Members, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class and Illinois Subclass, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs is similar to that suffered by all other Class Members, which was caused by the same misconduct by Defendants.

217. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class and Illinois Subclass. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

218. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct and

unjustly retain improperly obtained revenues or will otherwise escape liability for their wrongdoing as asserted herein.

219. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;
c. Whether Defendants' storage of Plaintiffs' and Class Member's Private Information was done in a negligent manner;
d. Whether Defendants had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;
e. Whether Defendants' conduct was negligent;
f. Whether Defendants' conduct violated Plaintiffs' and Class Members' privacy;
g. Whether Defendants took sufficient steps to protect individuals' Private Information;
h. Whether Defendants were unjustly enriched; and
i. The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

220. Information concerning Defendants' policies is available from Defendants' records.

221. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

222. The prosecution of separate actions by individual members of the Class and Illinois Subclass would run the risk of inconsistent or varying adjudications and establishing incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I
## NEGLIGENCE
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

223. Plaintiffs restate and reallege all of the foregoing factual allegations, as if fully set forth herein.

224. Defendants knowingly collected, possessed, and maintained Plaintiffs' and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

225. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

226. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the

importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

227. Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;
b. To protect the Private Information in their possession by using reasonable and adequate security procedures and systems compliant with industry standards;
c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;
d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;
e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and
f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

228. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

229. Defendants' duty also arose because Defendants were bound by industry standards to protect the confidential Private Information entrusted to them.

230. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

231. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

232. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

233. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

234. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private

Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;
b. Failing to adequately monitor the security of their networks and systems;
c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;
d. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;
e. Failing to comply with the FTCA and HIPAA;
f. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and
g. Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

235. Defendants acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

236. Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability

to protect their systems (and the Private Information that they stored on them) from attack.

237. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

238. As a result of Defendants' ongoing failure to notify Plaintiffs and Class Members regarding the Data Breach, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

239. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

240. As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

241. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

242. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at

imminent risk of further harm.

243. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

244. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

245. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

246. Plaintiffs restate and reallege all of the foregoing factual allegations as if fully set forth herein.

247. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

248. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

249. Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

250. Defendants breached their duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

251. Specifically, Defendants breached their duties by failing to employ industry-standard cybersecurity measures to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

252. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendant's duty in this regard.

253. Defendants also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

254. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

255. Plaintiffs and Class Members are within the class of persons the FTCA and HIPAA are intended to protect, and Defendants' failure to comply with both constitutes negligence *per se*.

256. Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

257. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential

impact of the Data Breach on their lives.

258. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

259. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS, AGAINST HCSC)**

260. Plaintiffs re-allege and incorporate by reference the foregoing factual allegations as if fully set forth herein.

261. HCSC required Plaintiffs and Class Members to provide and entrust their Private Information to HCSC as a condition of obtaining insurance products and related services.

262. When Plaintiffs and Class Members provided their Private Information to HCSC, they entered into implied contracts with HCSC pursuant to which HCSC agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and Class Members if and when their Private Information

was breached and compromised.

263. Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts with HCSC when they agreed to provide their Private Information and/or payment to HCSC.

264. The valid and enforceable implied contracts that Plaintiffs and HCSC Subclass Members entered into with HCSC included HCSC's promises to protect Private Information it collected from Plaintiffs and Class Members, or created on its own, from unauthorized disclosures. Plaintiffs and Class Members provided this Private Information in reliance on HCSC's promises.

265. Under the implied contracts, HCSC promised and was obligated to (a) provide insurance coverage and related services to Plaintiffs and HCSC Subclass Members; and (b) protect Plaintiffs' and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiffs and Class Members agreed to provide HCSC with payment and their Private Information.

266. HCSC promised and warranted to Plaintiffs and Class Members, including through their public-facing privacy documents identified above, to maintain the privacy and confidentiality of the Private Information it collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

267. HCSC's adequate protection of Plaintiffs' and Class Members' Private Information was a material aspect of these implied contracts with HCSC.

268. HCSC solicited and invited Plaintiffs and Class Members to provide their Private Information as part of HCSC's regular business practices. Plaintiffs and Class Members accepted HCSC's offers and provided their Private Information to HCSC.

269. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that HCSC's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, HITECH, and with industry standards.

270. Plaintiffs and Class Members who contracted with HCSC for insurance coverage and related services and provided their Private Information to HCSC reasonably believed and expected that HCSC would adequately employ adequate data security to protect that Private Information. HCSC failed to do so.

271. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to HCSC and agreed HCSC would receive payment for, amongst other things, the protection of their Private Information.

272. Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to HCSC.

273. HCSC materially breached their contractual obligations to protect the Private Information it required Plaintiffs and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to HCSC's inadequate data security measures and procedures.

274. HCSC materially breached their contractual obligations to deal fairly and in good faith with Plaintiffs and Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify Plaintiffs and Class Members of the Data Breach.

275. HCSC materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, by failing to otherwise protect Plaintiffs' and Class Members' Private Information, and/or by failing to prevent the same data security failures by its business associate/vendor Conduent that handled Private Information, as set forth *supra*.

276. The Data Breach was a reasonably foreseeable consequence of HCSC's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and Class Members.

277. As a result of HCSC's failures to fulfill the data security protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains with HCSC and instead received services of a diminished

value compared to that described in the implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

278. Had HCSC disclosed that its data security was inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with HCSC.

279. Plaintiffs and Class Members would not have provided and entrusted their Private Information to HCSC in the absence of the implied contracts between them and HCSC.

280. Plaintiffs and Class Members fully performed their obligations under the implied contracts with HCSC.

281. HCSC breached the implied contracts with Plaintiffs and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely or adequate notice that their Private Information was compromised in and due to the Data Breach.

282. As a direct and proximate result of HCSC's breach of their implied contracts with Plaintiffs and Class Members and the attendant Data Breach, Plaintiffs and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of

the bargain they struck with HCSC.

283. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**COUNT IV**
**BREACH OF THIRD PARTY BENEFICIARY CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS AND AGAINST CONDUENT)**

284. Plaintiffs restate and reallege all of the foregoing factual allegations, as if fully set forth herein.

285. Conduent entered into contracts, written or implied, with its Clients, including HCSC, to perform services. Upon information and belief, these contracts are virtually identical between and among Conduent and its Clients around the country whose own clients, including Plaintiffs and Class Members, were affected by the Data Breach.

286. In exchange, Conduent agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

287. These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Conduent and its Clients, including HCSC. Conduent knew that if it were to breach these contracts with its Clients, its Clients' clients —Plaintiffs and Class Members—would be harmed.

288. Conduent breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiffs and Class Members thereof.

289. Plaintiffs and the Class were harmed by Conduent's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

290. Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**<u>COUNT V</u>**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

291. Plaintiffs restate and reallege all of the foregoing factual allegations, as if fully set forth herein.

292. Plaintiffs and Class Members conferred a benefit on Defendants by permitting Conduent's Clients, such as HCSC, to turn over their Private Information to Conduent. Moreover, upon information and belief, Plaintiffs and Class Members allege that payments made by HCSC and other Conduent Clients to Conduent included payment for cybersecurity protection to protect Plaintiffs' and Class

Members' Private Information, and that those cybersecurity costs were passed on to Plaintiffs and Class Members in the form of elevated prices charged by Conduent Clients for their services. But Plaintiffs and Class Members did not receive such protection.

293. Upon information and belief, Defendants fund their data security measures entirely from its general revenue, including, in the case of Conduent from payments made to it by its Clients on behalf of Plaintiffs and Class Members.

294. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

295. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received indirectly from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

296. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments they received for adequate data security

measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

297. If Plaintiffs and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

298. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

299. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further

unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

300. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

301. Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VI
## ILLINOIS PERSONAL INFORMATION PROTECTION ACT, 815 ILL. COMP. STAT. §§ 530/10(A), ET SEQ.
## (ON BEHALF OF PLAINTIFFS AND THE ILLINOIS SUBCLASS)

302. Plaintiffs repeat and re-allege the factual allegations above as if fully set forth herein.

303. As entities that handle, collect, disseminate, and otherwise deal with nonpublic personal information, Defendants are "Data Collectors" as defined by 815 Ill. Comp. Stat. § 530/5.

304. Plaintiffs' and Illinois Subclass members' Private Information includes Personal Information as defined by 815 Ill. Comp. Stat. § 530/5.

305. As Data Collectors, Defendants were required to notify Plaintiffs and Illinois Subclass Members of a breach of Conduent's data security system in the most expedient time possible and without unreasonable delay.

306. By failing to disclose the Data Breach in the most expedient time possible and without unreasonable delay, Defendants violated 815 Ill. Comp. Stat. § 530/10(a).

307. Defendants' decision not to timely disclose the Data Breach to Plaintiffs and Illinois Subclass Members was knowing and willful.

308. Under 815 Ill. Comp. Stat. § 530/20, a violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

309. As a direct and proximate result of Defendants' violations of 815 Ill. Comp. Stat. § 530/10(a), Plaintiffs and Illinois Subclass Members suffered damages, as described above.

310. Plaintiffs and Illinois Subclass Members seek relief under 815 Ill. Comp. Stat. § 510/3 for the harm they suffered because of Defendants' willful violations of 815 Ill. Comp. Stat. § 530/10(a), including actual damages, equitable relief, costs, and attorneys' fees.

**CLAIM VII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT**
**(815 ILL. COMP. STAT. §505/1, *ET SEQ.*)**
**(ON BEHALF OF PLAINTIFFS AND THE ILLINOIS SUBCLASS AGAINST ALL DEFENDANTS)**

311. Plaintiffs repeat and reallege the foregoing factual allegations, as if fully set forth herein, and bring this claim on behalf of themselves and the Illinois Subclass.

312. Plaintiffs and the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiffs, the Illinois Subclass, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

313. Defendants are engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

314. Defendants' conduct against Plaintiffs and the Illinois Subclass is oppressive in that Plaintiffs and the Illinois Subclass had no choice but to share their Private Information with Defendants in order to obtain health insurance services

from HCSC, as well as other services from other Conduent Clients. On information and belief, all health insurance service providers require this information. Moreover, Plaintiffs and the Illinois Subclass were assured by Defendants that their Private Information would be secured.

315. Defendants' failure to safeguard Plaintiffs' and Illinois Subclass Members' Private Information—leaving it exposed to cybercriminals and other unauthorized actors—constitutes a substantial injury, in that Plaintiffs and the Illinois Subclass will not only have to spend the remainder of their lives at greater risk for identity theft and fraud (having to constantly monitor their accounts), but also live with the knowledge that their most intimate Private Information is subject to public view.

316. Additionally, Defendants violated FTC guidelines by failing to promptly dispose of Private Information when no longer required to be stored; encrypt information stored on computer networks; understand vulnerabilities of their networks; implement policies to correct security problems; use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack their systems; watch for large amounts of data being transmitted from their systems; and have response plans ready in the event of a breach. These failures constitute unfair acts or practices, subjecting them to an ICFA claim. 15 U.S.C. § 45.

317. Finally, Defendants violated the Personal Information Protection Act (PIPA) by failing to immediately notify Plaintiffs and the Illinois Subclass that their Private Information was exposed during the Data Breach. 815 ILCS § 530/10 (a) and (b). This too constitutes an unlawful practice under ICFA. 815 ILCS § 530/20.

318. These actions also constitute deceptive and unfair acts or practices because Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards, facts that would be unknown to and not easily discoverable by Plaintiffs and the Illinois Subclass.

319. Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would defeat Plaintiffs' and Illinois Subclass Members' reasonable expectations about the security of their Private Information.

320. Defendants intended Plaintiffs and the Illinois Subclass to rely on their deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

321. Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Illinois Subclass. Plaintiffs and the Illinois Subclass have been

adversely affected by Defendants' conduct, and the public was and is at risk as a result thereof.

322. In sum, Defendants' numerous failures in safeguarding Plaintiffs' and Illinois Subclass Members' Private Information violates ICFA.

323. As a result, Plaintiffs and the Illinois Subclass have suffered and will suffer injury, including but not limited to: (a) the compromise, publication, theft, and/or unauthorized use of their Private Information; (b) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft and fraud; (c) lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; (d) the continued risk to the publication of their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect Private Information in their possession; and (e) current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and the Illinois Subclass.

324. Defendants' failure to safeguard Plaintiffs' and Class Members' Private Information in violation of FTC guidelines and PIPA was the direct and proximate cause of damages incurred by Plaintiffs and the Illinois Subclass.

325. Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the CFA.

**CLAIM VIII**
**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(ILL. COMP. STAT. §510/2, *ET SEQ.*)**
**(ON BEHALF OF PLAINTIFFS AND THE ILLINOIS SUBCLASS)**

326. Plaintiffs repeat and reallege the foregoing factual allegations as if fully set forth herein and bring this claim on behalf of themselves and the Illinois Subclass.

327. Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

328. Defendants engaged in deceptive trade practices in the conduct of their businesses, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

a. Representing that goods or services have characteristics that they do not have;
b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;
c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

329. Defendants' deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Illinois Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;
b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;
c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' Private Information \, including duties imposed by the FTC Act, 15 U.S.C. § 45, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;
d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Illinois Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;
e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);
f. Failing to timely and adequately notify Plaintiffs and Illinois Subclass Members of the Data Breach;
g. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and Illinois Subclass Members' Private Information; and
h. Omitting, suppressing, and concealing the material fact that they did

not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

330. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

331. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

332. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiffs and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

333. Plaintiffs and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class and Illinois Subclass requested herein;
b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;
c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;
d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;
e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;
f. A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and
g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 14, 2025

Respectfully submitted,

*/s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

James J. Pizzirusso*
Kira Hessekiel*
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Email: jpizzirusso@hausfeld.com
Email: khessekiel@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
Tel.: (646) 357-1100
Email: snathan@hausfeld.com

***Counsel for Plaintiffs***

****pro hac vice forthcoming***